[Cite as *Tattershall One Condominium Unit Owners' Assn. v. Marks*, 2025-Ohio-343.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| TATTERSHALL ONE CONDOMINIUM UNIT OWNERS' ASSOCIATION, | CASE NO. 2024-P-0046 |
| Plaintiff-Appellee, | Civil Appeal from the Court of Common Pleas |
| - vs - | |
| TRACY L. MARKS, et al., | Trial Court No. 2024 CV 00018 |
| Defendants-Appellants. | |

## O P I N I O N

Decided: February 3, 2025
Judgment: Affirmed in part, reversed in part, and remanded

*Joel A. Holt* and *Megan Vogt*, Maguire Schneckenburger Legal Group, 190 East Avenue, Tallmadge, OH 44278 (For Plaintiff-Appellee).

*Tracy L. Marks* and *Robert W. Bretz*, pro se, 170 Bryn Mawr Street, Unit F, Ravenna, OH 44266, and *Linda L. Utterdyke*, pro se, 3784 State Route 303, Ravenna, OH 44266 (Defendants-Appellants).

MATT LYNCH, J.

{¶1}   Defendants-appellants, Tracy L. Marks, Robert W. Bretz, and Linda L. Utterdyke, appeal from the judgment of the Portage County Court of Common Pleas, granting summary judgment in favor of plaintiff-appellee, Tattershall One Condominium Unit Owners' Association.  For the following reasons, we affirm in part and reverse in part the judgment of the lower court and remand for further proceedings consistent with this opinion.

{¶2}   On January 9, 2024, Tattershall filed a Complaint against appellants.  The

Complaint alleged Utterdyke became the owner of a condominium unit within the Association on January 19, 2023, pursuant to a Transfer on Death Confirmation Affidavit. When Tattershall requested that Utterdyke submit to "acceptability checks," she refused to do so and "instead transferred the Unit to Marks and Bretz" who also "refused to comply with the Acceptability Checks." Count One raised a claim for Breach of Contract arguing that Bretz and Marks owned the unit in violation of the Association's bylaws and that "Utterdyke, Bretz, and Marks intentionally circumvented the rights of the Association and transferred the Unit in violation of the Bylaws." Count Two requested a declaratory judgment that the transfer from Utterdyke to Bretz and Marks was void. Count Three requested injunctive relief related to the failure to complete the checks. The defendants filed pro se Answers to the Complaint.

{¶3} On March 4, 2024, Utterdyke filed a Motion for Summary Judgment. She argued that she was not required to complete acceptability checks because she received the property as a gift and was permitted to sell the property to family members under the bylaws. Bretz and Marks filed a Motion for Summary Judgment on April 19, 2024, arguing they were not required to undergo acceptability checks as family members. Tattershall filed a Motion for Summary Judgment on the same date, arguing that all defendants were subject to acceptability checks. The following evidence was presented through the summary judgment motions and attached exhibits and affidavits:

{¶4} 170 Bryn Mawr Street, Unit F is a condominium subject to the governing documents of the Tattershall One Condominium Unit Owners' Association and had been owned by Dorothy Clark since 1973. A Transfer on Death Designation Affidavit filed on June 14, 2021, indicated that Clark, Utterdyke's aunt, gifted the property to her. Clark

2

died on December 28, 2022. Utterdyke filed a Transfer on Death Confirmation Affidavit on January 19, 2023. She testified that she sold the unit to her son, Bretz, and Marks, his fiancée, on January 19 and they had resided there since that date. The Condominium Warranty Deed filed on January 27, 2023, indicated that the condo was sold to Bretz and Marks. A Mortgage Deed recorded on January 27, 2023, indicated that the two owed Utterdyke a sum of $50,000 for the property. Utterdyke further indicated that the President of the Board of Managers of Tattershall, Brian Richards, told her in January 2023 that she was not required to submit to acceptability checks and that she verbally told him in January that she sold the unit. Utterdyke stated that she gave written notice of her ownership and sale of the property to Richards and Treasurer Sandra Retherford via personally delivered letters. Copies of letters dated March 2, 2023, were attached to her Motion for Summary Judgment, indicating those facts.

{¶5} Bretz's affidavit indicated that he was not given written notice requesting a background or credit check or an application for membership in the Association.

{¶6} Brian Richards testified via affidavit that the Association oversees and regulates all units in the Tattershall One Condominiums. He asserted that the Association had amended its Condominium Bylaws on July 11, 2022, which restricted occupancy of units by requiring owners or occupants to submit to criminal background and credit checks and permits the Association to prohibit individuals from owning or occupying units based on those results. He contended that the Association requested Utterdyke submit to acceptability checks upon learning she had taken ownership, which requests she refused. He stated that Utterdyke transferred the unit without affording the Association the opportunity to request Bretz and Marks comply with acceptability checks. The

3

Association "repeatedly requested that they submit to, and provide relevant information for, the Acceptability Checks" but they refused to do so.

{¶7} In pertinent part, Article XI of the 1973 Tattershall One Condominium bylaws and 1977 amendments provides:

(1) [I]f an owner wishes to dispose of and convey his unit, the board of managers shall have the option, but not the obligation, to purchase the unit for an amount equal to the then reasonable market value of such unit less the unpaid balance of any mortgage indebtedness or other lien or encumbrance.

. . .

(4) The option of the board of managers provided herein shall be exercisable by the board of managers within fifteen (15) days following receipt of written notice from the unit owner that he has written a contract of sale to a bona fide purchaser subject to the sole condition that the board of managers does not exercise the option provided herein.

(5) If the board of managers fails to exercise its option to purchase the unit within fifteen (15) days following receipt of such written notice from the unit owner that he has such contract, or if the board of managers, by notice in writing to the unit owner waives the option provided for herein, the unit owner may sell and convey his unit to any person who has been previously designated as acceptable as a purchaser (such designation to be in writing by the board of managers) and who assumes all the obligations of his predecessor unit owner . . . .

{¶8} The following was added to Article XI, Section 5 of the bylaws in the 2022 amendment:

In determining whether a person is acceptable as a purchase[r] or occupant of any unit, the Board of Managers may consider any of the following:

. . .

b) The Association shall have the right, but not the obligation to request a background check on any potential or proposed Owners or Occupants of any Unit. The Association may prohibit or disallow Persons with a history of felonies, or violent misdemeanor convictions from Owning or Occupying any Unit. Only felonies and violent misdemeanor convictions which impact

4

the Association's legitimate interest in protecting the community may be considered in any decision to deny a Person ownership or occupancy of a Unit. . . .

c) The Association shall have the right, but not the obligation to request a credit report on any potential or proposed Owners or Occupants of any Unit. The Association may prohibit or disallow Persons with credit score of under 675 from owning or occupying any unit. . . .

. . .

Any conflict between this provision and any other provisions of the Declaration and Bylaws shall be interpreted in favor of this restriction on the occupancy of Units. . . .

{¶9}	Article XI also contains the following provision:

(7)	Notwithstanding the foregoing provisions of this article XI, the unit owner may convey his unit by gift, bequest, sale, or otherwise, to a member of his family without granting a first option to the board of managers and without securing the approval of the board of managers of the conveyance to such person in the unit owner's family.

{¶10}	The trial court issued a Journal Entry on July 8, 2024, granting Tattershall's Motion for Summary Judgment and denying appellants' Motions.	It found that "the sole issue brought before the Court in Plaintiff's Complaint is whether the Defendants have complied with Article XI, Section 5 of the Bylaws of the Plaintiff Association" which "requires potential owners or occupants of units in the subject condominium complex to submit to 'acceptability checks' prior to owning or occupying said units and permitting the Association to prohibit ownership or occupancy based upon said results."	It concluded: "In its Motion for Summary Judgment, Plaintiff clearly demonstrates Defendants' failure to comply with the requirements of the subject Bylaws.	Defendants, on the other hand, present in their Motions for Summary Judgment no plausible argument as to why the requirements of the subject Bylaws should not apply to them."

{¶11}	On July 31, 2024, a Magistrate's Decision was issued ordering that the

Case No. 2024-P-0046

appellants pay attorney fees jointly and severally in the amount of $20,500.55. It found that such fees were warranted for "attempting to have Defendants comply with the rules and regulations of the Association" and counsel did not engage in unreasonable legal work. The court adopted the decision on the same date.

{¶12} Appellants timely appeal and raise the following assignments of error:

{¶13} "[1.] The trial court committed prejudicial error in granting plaintiff-appellee, Tattershall One's, motion for summary judgment since they failed to prove the existence of a valid contract between Tattershall One and defendants-appell[ant]s, Utterdyke, Bretz and Marks."

{¶14} "[2.] The trial court committed prejudicial error in denying defendant-appellant, Utterdyke's motion for summary judgment finding Utterdyke did not comply with Article XI, Section 5, in acquiring her deed under R.C. 5302.222 to be a violation under the governing documents of Tattershall One."

{¶15} "[3.] The trial court committed prejudicial error in denying defendants' motions for summary judgment without applying Section 7, Article XI of Tattershall One's bylaws to the proposed owners."

{¶16} "[4.] The trial court committed prejudicial error in denying defendants-appellants, Utterdyke, Bretz, and Marks', motions for summary judgment finding defendants did not comply with Article XI, Section 5 bylaws of Tattershall One . . . when the board of managers failed to assert their right to background checks/credit checks by written request."

{¶17} "[5.] The court committed prejudicial error awarding plaintiff-appellee attorney fees when Richards made affidavit in bad faith by prosecuting the wrong contract

6

and violating statutory law and bylaws."

{¶18} Pursuant to Civil Rule 56(C), summary judgment is proper when (1) the evidence shows "that there is no genuine issue as to any material fact" to be litigated, (2) "the moving party is entitled to judgment as a matter of law," and (3) "it appears from the evidence . . . that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence . . . construed most strongly in the party's favor."

{¶19} A trial court's decision to grant summary judgment is reviewed by an appellate court under a de novo standard of review. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). "A de novo review requires the appellate court to conduct an independent review of the evidence before the trial court without deference to the trial court's decision." *Peer v. Sayers*, 2011-Ohio-5439, ¶ 27 (11th Dist.).

{¶20} In their first assignment of error, the appellants argue that "the controlling contract in this case should be based upon the governing Bylaws of Tattershall One Condominium Unit Owners Association" but that Tattershall "asserts a different controlling contract, Exhibit 7," attached to its summary judgment filings, which is the bylaws of "Tattershall Three Condominium Unit Owners Association."

{¶21} Tattershall contends that the document relating to Tattershall Three was included inadvertently and did not impact the lower court's summary judgment ruling. We agree. Tattershall did not argue below that the Tattershall Three Association bylaws should apply, nor did the trial court mention Tattershall Three in its judgment. The full bylaws of Tattershall One were included in the defendants' Motions for Summary Judgment and were part of the record. Moreover, Tattershall attached to its Motion for

7

Summary Judgment the Amendment to the Bylaws of Tattershall One Condominium Unit Owners' Association, which included the pertinent amendments to Tattershall One bylaws in dispute in the present proceeding. Inadvertent attachment of additional documents did not impact the summary judgment ruling.

{¶22} Appellants argue that Tattershall "did not assert the Bylaws of Tattershall One dated December 15, 1973, as amended May 5, 1977, to be their governing documents" and, thus, the terms of the contract are "ambiguous." A dispute over which contract applied, even if there was such dispute in this case, does not render the terms of a written contract ambiguous. Nonetheless, there is no genuine dispute as to which bylaws applied here. Tattershall's Motion for Summary Judgment asserts that the appellants are subject to the bylaws of the Tattershall One Condominium Unit Owners' Association and the 2022 Amendment. To the extent that appellants argue they are not bound by the Tattershall One bylaws and amended bylaws, this will be addressed in the second assignment of error.

{¶23} Appellants also argue that the 2022 Amendment to the bylaws was not properly enacted pursuant to Article XVIII(1), which states: "These bylaws may be amended from time to time at an annual or special meeting of the unit owners association by an affirmative vote of not less than seventy-five percent (75%) of the unit owners in terms of each unit owner's percentage of interest in the common areas and facilities."

{¶24} Tattershall argues that this issue was not raised below and thus was waived. Bretz's response to the motion for summary judgment notes that "[i]t is evident there was no meeting to take a vote because various members signed on different days and not at any meeting." This raises the issue sufficiently that it may be addressed on

8

Case No. 2024-P-0046

appeal.

{¶25} Appellants do not present specific evidence as to whether a meeting was held. We recognize that the amended bylaws were adopted through signatures from the various condominium owners, signed and notarized on various days, tending to show the bylaws were not amended at a meeting. Nonetheless, we find no error in the enactment of the amendment in that manner. As asserted by Tattershall, R.C. 1702.25(A), which applies to non-profit corporations such as Tattershall, provides the following:

> Unless the articles or the regulations prohibit the authorization or taking of any action of the incorporators, the members, or the directors without a meeting, any action that may be authorized or taken at a meeting of the incorporators, the members, or the directors, as the case may be, may be authorized or taken without a meeting with the affirmative vote or approval of, and in a writing or writings signed by, all of the incorporators, all of the members, or all of the directors, as the case may be, who would be entitled to notice of a meeting for that purpose, or, in the case of members, any other proportion or number of voting members, not less than a majority, that the articles or the regulations permit.

{¶26} Tattershall asserts that all owners signed the amendment and the record indicates signatures of all owners from Units A through L, who are "members" of the Association under the bylaws. The Amendment to Declaration page preceding the signature pages and amendments indicated that "Unit Owners representing at least 75% of the Association's current voting power have executed the signature pages to this instrument." Article XVIII of the bylaws allows amendment at a meeting but does not prevent amendment through writings signed by members owning the units, in at least a proportion of 75%. The amendment also complies with R.C. 5311.08(B), which requires that amendments to bylaws of condominium unit associations be "filed for record," since they were recorded by the County Recorder on July 21, 2022. While appellants argue that they were not on notice that the amendments were enacted given the lack of a

9

meeting, this procedure was sufficient to put Clark and future potential owners of the condos on notice of the fact that the bylaws had been amended.

{¶27} The first assignment of error is without merit.

{¶28} In their second assignment of error, the appellants argue that the 2022 Amendments were not in place at the time Clark recorded the Transfer on Death Designation Affidavit on June 6, 2021, when Utterdyke "became a potential owner," and so did not apply to her.

{¶29} Owners of condominium units are required to "give up a certain degree of freedom of choice which [they] might otherwise enjoy in separate, privately owned property." (Citation omitted.) *Kellogg Commons Condominium Assn., Inc. v. Carlington*, 1994 WL 102244, *2 (11th Dist. Mar. 18, 1994). "[I]f a declaration has provided notice . . . to a potential purchaser that the condominium association may amend the declaration, then the fact that the purchaser has not foreseen a *particular* amendment is not dispositive." *Worthinglen Condominium Unit Owners' Assn. v. Brown*, 57 Ohio App.3d 73, 77-78 (10th Dist. 1989). Article XVI(2) of the condominium bylaws states: "All unit owners, their tenants and all persons lawfully in possession and control of any part of a condominium property shall comply with all covenants, conditions, and restrictions set forth in a deed to which they are subject and in the declaration, these bylaws, [and] the administrative rules and regulations, as amended from time to time."

{¶30} Even presuming that a bylaw amended after ownership only applied to future owners, the fact that Clark executed the Transfer on Death Designation Affidavit did not make Utterdyke an owner at that time. *See* R.C. 5302.23(B)(4) ("The designation of a transfer on death beneficiary has no effect on the present ownership of real property,

10

and a person designated as a transfer on death beneficiary has no interest in the real property until the death of the owner of the interest."). At the time Utterdyke took ownership, upon the death of Clark, the 2022 Amendment had already been enacted. We do not find that she provides a legal basis under which the 2022 Amendment did not apply to her, nor a reason why it would not apply to Bretz and Marks.

{¶31} Utterdyke also argues those requirements in Article XI requiring the submission of the sale of the property to the board of managers to exercise the option to purchase and to approve potential buyers are inapplicable due to the Article XI, Section 7 exception. Article XI(7) provides that, "[n]otwithstanding the foregoing provisions of this article XI, the unit owner may convey his unit by gift, bequest, sale, or otherwise, to a member of his family without granting a first option to the board of managers and without securing the approval of the board of managers of the conveyance to such person in the unit owner's family." It defines a family member, however, as "the wife or husband of the unit owner and any children, brothers, sisters, or parents of the unit owner, along with such other categories of relationship to the unit owner as the board of managers may thereafter establish by regulation." There is nothing in the record demonstrating other relationships have been established by regulation. Utterdyke is Clark's niece and does not qualify as a family member to which Article XI(7) would apply.

{¶32} Utterdyke also contends that since the unit was a gift to her, approval of the Association was not necessary under any portion of Article XI. In support, she cites *Webster v. Ocean Reef Community Assn., Inc.*, 994 So.2d 367 (Fla. App. 2008), which held that language in homeowners' association articles of incorporation requiring approval of a "purchaser" did not apply to a donee.

11

Case No. 2024-P-0046

{¶33} As cited above, Article XI sets forth a process providing the board of managers an option to purchase a unit and/or approve of the acceptability of a purchaser. It states that when an owner "wishes to dispose of and convey his unit," the board shall have the option to purchase the unit "for an amount equal to the then reasonable market value of such unit" and that the option to do so shall be exercised within fifteen days "following receipt of written notice from the unit owner that he has *written a contract of sale to a bona fide purchaser*." Article XI(1) and (4).

{¶34} Article XI(5) states: "If the board of managers fails to exercise its option to purchase the unit within fifteen (15) days following receipt of such written notice from the unit owner *that he has such contract*" or if the option is waived "the unit owner may sell and convey his unit to any *purchaser* who has been previously designated as acceptable as a *purchaser* (such designation to be in writing by the board of managers) . . . ."

{¶35} The provisions set forth in Article XI allow for an owner of a unit to "sell and convey" his unit to a "purchaser" who has been designated as acceptable by the board of managers. It does not, however, address a situation in which the owner seeks to gift the unit to someone other than a family member. It does not contain language relating to the acceptability of a donee but a "purchaser." The process for the board to exercise an option to purchase is triggered by a written contract of sale. The provision allowing the board of managers to decline its option is the same which discusses the designation of acceptability. In other words, the entirety of the process contemplated above relates to the sale, rather than the gift, of a unit. "If the terms of the written instrument are clear and unambiguous, courts must give the words their plain and ordinary meaning . . . ." *Perry Cty. Bd. of Commrs. v. Hocking Technical College*, 2023-Ohio-3439, ¶ 15 (5th Dist.),

12

Case No. 2024-P-0046

citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246 (1978). A purchaser is defined as "[s]omeone who obtains property for money or other valuable consideration; a buyer." *Black's Law Dictionary* (12th Ed. 2024). *See also* R.C. 5311.01(Z) ("'[p]urchaser' means a person who purchases a condominium ownership interest for consideration pursuant to an agreement for the conveyance or transfer of that interest for consideration"). It may be the case that it was intended that any owner of a unit would be required to submit to acceptability checks but this is not the wording of the process set forth in Article XI.

{¶36} We recognize that the 2022 amended bylaws include additional provisions relating to acceptability checks in Article XI, Section 5. It states: "In determining whether a person is acceptable as a purchase[r] or occupant of any unit, the Board of Managers may consider any of the following," followed by provisions allowing it to conduct background checks and credit checks. In pertinent part, they provide: "The Association shall have the right, but not the obligation to request a background check on any potential or proposed Owners or Occupants of any Unit. The Association may prohibit or disallow Persons with a history of felonies, or violent misdemeanor convictions from Owning or Occupying any Unit" and "[t]he Association shall have the right, but not the obligation to request a credit report on any potential or proposed Owners or Occupants of any Unit. The Association may prohibit or disallow Persons with credit score of under 675 from owning or occupying any unit . . . ." While they provide the Association the right to seek such checks and that they may prohibit ownership based on the results, these provisions are immediately preceded by the language stating that they are factors used to determine whether a person is "acceptable" as a purchaser. In other words, under the wording of

13

Case No. 2024-P-0046

the bylaws, the Board may request background checks and credit checks to determine whether a person "is acceptable as a purchaser or occupant." These provisions are methods by which the board of managers can conduct those acceptability checks for purchasers outlined in the preceding portion of Section 5. Again, Utterdyke was not a purchaser and she further asserted that she was not an occupant, given that she owned the property for only a short period of time before selling it to her son and his fiancée.

{¶37} While Tattershall argues the provisions in the 2022 Amendment set forth a process separate from the acceptability check previously provided for in the initial bylaws ("the unit owner may sell and convey his unit to any purchaser who has been previously designated as acceptable as a purchaser (such designation to be in writing by the board of managers")), this is inconsistent with their language. They specifically provide that the background checks and credit checks may be used by the board of managers "[i]n determining whether a person is acceptable as a purchase[r] or occupant of any unit." It is evident that they were created as the methods to follow in determining the acceptability determination contemplated in the original language of the bylaws. This is further evidenced by the fact that the initial bylaws did not set forth any particular factors for the board of managers to determine whether a purchaser was acceptable. For these reasons, we reverse the decision that Utterdyke was subject to the bylaws' requirement for acceptability checks.

{¶38} The second assignment of error is with merit to the extent discussed above.

{¶39} In their third assignment of error, the appellants repeat the argument that Article XI, Section 7 applies to Utterdyke because she was Clark's family member. This lacks merit for the reasons discussed above.

14

Case No. 2024-P-0046

{¶40} The appellants next argue that the court erred when it found that Bretz and Marks were subject to acceptability checks without applying Section 7 of Article XI.

{¶41} As described above, Section 7 provides that, "[n]otwithstanding the foregoing provisions of this article XI," a unit may be sold to a family member without securing approval from the board of managers. Family as defined in that provision includes the children of the unit owner and thereby applies to the conveyance from Utterdyke to her son, Bretz. Under the language of Section 7, the conveyance to Bretz was not subject to the other requirements of Article XI, including approval of the sale, since Section 7 applies "notwithstanding" the preceding provisions setting forth the process for the board of managers to exercise their option and obtain approval of purchasers. "[N]otwithstanding" means "without prevention or obstruction from or by; in spite of." (Citation omitted.) *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-65, ¶ 70. "Provisions included in a clause invoking that term override any conflicting provisions." *Id.*

{¶42} Tattershall argues that this provision does not preclude the requirement that the board of managers determine that a purchaser is acceptable, regardless of whether they are a family member. They argue: "while it may appear that the Acceptability Checks constitute the Board's 'approval' of a conveyance . . . [t]he Acceptability Checks are not a means for the Board to approve a conveyance; they are a means for the Board to approve potential/proposed owners and occupants of Units." We do not find this distinction to be evident from the language in the bylaws. Article XI, Section 5 provides that "the unit owner may sell and convey his unit to any purchaser who has been previously designated as acceptable as a purchaser." The conveyance of the property is

15

necessarily contingent upon approval of the purchaser. Section 7 specifically exempts a family member from the requirement of "securing the approval of the board of managers of the conveyance to such person in the unit owner's family." It can only be referencing the requirement to obtain a finding of acceptability from the board of managers, otherwise it would be unnecessary to secure "approval" for the conveyance to such person.

{¶43} Tattershall also argues that, regardless of whether the wording of Section 7 applies to Bretz, such provision should not be enforced because it conflicts with the 2022 Amendment to Section 5 and the Amendment provides "[a]ny conflict between this provision [addition to section 5] and any other provisions of the Declaration and Bylaws shall be interpreted in favor of this restriction on the occupancy of Units." However, this argument presumes there is a conflict between Section 7 and the amended Section 5. Section 5 includes the provisions that background checks and credit checks may be requested as part of determining acceptability and that owners not passing such tests may be precluded from ownership. It does not state that sales or gifts to family members are or are not included. Section 7 specifically states that it applies "notwithstanding" those other provisions throughout Article XI. This is not a conflict but simply an exception to those provisions set forth in Article XI. We find that Section 7 applies to exempt Bretz from acceptability checks and summary judgment should have been granted in his favor.

{¶44} The analysis above does not apply to Marks. As discussed above, Section 7's definition of family members does not include a son's fiancée. Further, the other sections within Article XI apply to the sale to Marks. Section 5 provides that an owner "may sell and convey his unit to any purchaser who has been previously designated as acceptable as a purchaser." The record indicates that Marks had not been designated

16

as an acceptable purchaser and there is no question that she did not submit to an acceptability check. As such, we agree with the trial court's grant of summary judgment against Marks.

{¶45} The third assignment of error is with merit in part.

{¶46} In their fourth assignment of error, the appellants first raise arguments relating to whether they were occupants of the property. Resolution of this question is not necessary and/or is moot based on the analysis contained in the foregoing assignments of error.

{¶47} Appellants next argue they were not required to submit to acceptability checks because they were not provided written requests to do so, citing Article XV: "Any notice by the board of managers to a unit owner shall be deemed to be duly given, and any demand upon him shall be deemed by him to have been duly made, if delivered in writing to him personally, or if mailed by registered letter in any post office."

{¶48} It is not clear that the request for acceptability check is a "notice" and it is not referenced as such. Nonetheless, the notice provision relates to "unit owners." The provisions relating to acceptability contemplate that acceptability is to be determined by the board of managers prior to sale. As such, a potential owner would not be a party to which notice would be required to be given under this section.

{¶49} The fourth assignment of error is without merit.

{¶50} In their fifth assignment of error, the appellants argue that it was an error to award attorney fees to Tattershall when the appellees had "unclean hands" and errors were made such as attaching the wrong bylaws to the motion for summary judgment, certain documents were not provided in discovery, and Tattershall "made an affidavit in

17

bad faith." Tattershall contends that appellants "appealed the MSJ order," not the Magistrate's Decision awarding attorney fees.

{¶51} We observe that the appellants' Notice of Appeal stated that they were appealing the summary judgment entry and the "Magistrate's Decision time-stamped July 31, 2024," awarding attorney fees. Further, attached to the Notice of Appeal were both of these entries. Thus, appellants did appeal from that entry.

{¶52} However, appellants filed their notice of appeal on August 6, 2024, without filing objections to the Magistrate's Decision, adopted by the trial court on July 31, 2024. Appellants only later filed an August 14, 2024 motion for extension of time to file objections, granted by the trial court on August 16. It has been held that a trial court cannot grant additional time to file objections to a magistrate's decision after a party has appealed from that decision since it is divested of jurisdiction to do so. *Ulery v. Ulery*, 2011-Ohio-5211, ¶ 5 (2d Dist.). In the absence of timely and properly filed objections to a magistrate's decision in such circumstances, a plain error standard is applied. *Id.* at ¶ 6; *Babcock v. Welcome*, 2012-Ohio-5284, ¶ 15 (4th Dist.). "'Plain error' is often construed to encompass 'error[s] of law or other defect[s] evident on the face of the magistrate's decision,' which prohibit the adoption of a magistrate's decision even in the absence of objections." (Citations omitted.) *Auto Loan v. Sisler*, 2022-Ohio-3282, ¶ 8 (11th Dist.).

{¶53} As an initial matter, we determine the issue of attorney fees only as it relates to Marks since we have determined that the claims against Utterdyke and Bretz lack merit for the reasons outlined above. The award of attorney fees against them is reversed.

{¶54} Marks argues that the doctrine of unclean hands applies, in that the conduct outlined above means they should not recover. We initially observe that the doctrine of

18

Case No. 2024-P-0046

unclean hands "is an affirmative defense," and generally must "be raised in the pleadings or in an amendment to the pleading, or it is waived." (Citations omitted.) *Littler v. Janis*, 2024-Ohio-1145, ¶ 29 (10th Dist.). *See Keybank Natl. Assn. v. Environment First Servs. Co, Inc.*, 2002-Ohio-3126, ¶ 23 (11th Dist.) (doctrine of unclean hands should have been raised in a responsive pleading under Civ.R. 8(C)). We observe that while the Answer submitted by Utterdyke, asserted as an affirmative defense "unclean hands," Marks' Answer does not raise the defense.

{¶55} Nonetheless, even applying the doctrine, we find no error by the trial court in determining that an award of attorney fees was appropriate in this matter. We do not find that Tattershall took actions that caused them to have unclean hands. "The cardinal maxim of equity jurisprudence, that he who comes into equity must come with clean hands, requires that the party seeking equitable relief not be guilty of reprehensible conduct with respect to the subject matter of the suit." (Citation omitted.) *Id.* Its failure to hold annual meetings or provide meeting minutes is not related to the present matter. *Id.* Further, those issues such as attaching the wrong bylaws or alleged matters relating to discovery have not been demonstrated to impact the proceedings in any manner such that recovery of attorney fees was improper as to Marks.

{¶56} However, while the attorney fees were entered jointly and severally against all of the defendants, different arguments were raised regarding the basis for their liability under the condominium regulations. There may have been differing costs to address those arguments or motions filed by Marks in contrast to those filed by the other defendants (Utterdyke in particular, who filed separate motions from those of Marks and Bretz). On remand, the trial court is to consider whether the awarded total amount of

19

attorney fees is proper solely against Marks or whether a modification of the amount is necessary given reversal of the judgments against Bretz and Utterdyke.

{¶57} The fifth assignment of error is with merit to the extent discussed above.

{¶58} For the foregoing reasons, we reverse the decision of the lower court granting summary judgment against Bretz and Utterdyke, affirm the decision granting summary judgment against Marks, and remand for further proceedings consistent with this opinion. Costs to be taxed against the parties equally.

ROBERT J. PATTON, P.J.,

JOHN J. EKLUND, J.,

concur.

Case No. 2024-P-0046